IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| WILLIAM T.[1], | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 7:21cv00550 |
| | ) |
| KILOLO KIJAKAZI, | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION

Plaintiff William T. ("William") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. William alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) determine his RFC, including using a function-by-function analysis; and (2) assess his allegations regarding his symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 16) and **DENYING** William's Motion for Summary Judgment (Dkt. 14).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

support the Commissioner's conclusion that William failed to demonstrate that he was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

William filed for DIB in August 2019, claiming that his disability began on December 17, 2018, due to total right knee replacement. R. 15, 52, 210. William's date last insured is December 31, 2024; thus, he must show that his disability began on or before this date and existed for twelve continuous months to receive DIB. R. 16; 42 U.S.C. §§ 423(a)(1)(A),

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

(c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied William's application at the initial and reconsideration levels of administrative review. R. 52–71. On February 25, 2021, ALJ Jeffrey Schueler held a hearing to consider William's claim for DIB. R. 30–51. Counsel represented William at the hearing, which included testimony from vocational expert Darren Wright. On March 11, 2021, the ALJ entered his decision analyzing William's claims under the familiar five-step process[3] and denying his claim for benefits.[4] R. 15–25.

The ALJ found that William suffered from the severe impairments of knee degenerative joint disease with right knee replacement and obesity.[5] R. 18. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. Id. The ALJ considered listing 1.02 (major joint dysfunction), as well as William's obesity in accordance with SSR 19-2p. R. 18–19.

The ALJ concluded that William retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 19. Specifically, William can only occasionally climb, balance, stoop, kneel, crouch, or crawl. Id. The ALJ determined that William was unable to perform his past relevant work as a maintenance repairer, industrial. R. 23. However, he could

---

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[4] William was 51 years old on the date the application was filed and 53 years old on the date of the ALJ's decision, making him a person closely approaching advanced age under the Act. R. 23, 52.

[5] The ALJ found William's other impairments, including right ankle pain, left sided numbness, lower extremity neuropathy, kidney stones, gout, and hypertension either non-severe or not medically determinable. R. 18.

perform other jobs that exist in significant numbers in the national economy, such as marker and classifier. R. 24. Thus, the ALJ determined that William was not disabled. R. 24–25. William appealed the ALJ's decision, and the Appeals Council denied his request for review on September 13, 2021. R. 1–3.

## ANALYSIS

William alleges that the ALJ's RFC findings are not supported by substantial evidence, including that the ALJ failed to determine his RFC using a function-by-function analysis and failed to properly assess his allegations regarding his symptoms, including by failing to properly weigh the opinion of his doctor, Preston A. Waldrop, M.D.

**A. Medical History Overview**

Prior to the alleged onset date of disability, as the ALJ noted, William had "severe right knee degeneration." R. 22. William underwent a total right knee replacement on December 17, 2018, which is also his alleged onset date of disability.[6] R. 296. At a follow-up appointment in January 2019, two weeks post-surgery, he was reported to be doing "pretty well" with "no major complaints" and was transitioned to outpatient therapy. R. 418. William also participated in approximately three months of physical therapy, post-surgery, beginning in January 2019, and was discharged on April 16, 2019, able to resume all his activities of daily living and having met all his goals. R. 523.

At six weeks post-surgery, William had good motion and stability, but needed to continue to work on straightening his leg. R. 415. At a February 2019 appointment, William complained of right leg swelling and tenderness, but had intact strength and reflexes, and improved sensation; his doctor noted the swelling was "circumferential' and did not see any neurologic

---

[6] The ALJ provides a summary of records beginning almost a year prior to the knee replacement surgery and alleged onset date. R. 20.

issues. R. 372. At subsequent appointments through March 2019, William had improvement, but still complained of pain, and reported difficulty standing for long periods. R. 412. Dr. Waldrop indicated William would not be able to go back to his previous job without restrictions, and imposed restrictions of carrying 50 pounds, no squatting or kneeling, and limited stair climbing. R. 406, 412. Dr. Waldrop advised him to "increase activities on a progressive basis as pain allows." R. 413. By December 2019, almost a year post-surgery, William reported "minimal if any pain" and Dr. Waldrop indicated he was "doing just fine" and his previous work restrictions would remain. R. 447.

State agency physicians, William Rutherford, M.D. and Michael Koch, M.D. reviewed the record in October 2019 and April 2020 and both found William capable of a limited range of light work. R. 57–58, 67–69. The ALJ found these opinions persuasive. R. 23.

**B. Physical RFC and Function-by-Function Analysis**

William argues that the ALJ's physical RFC findings are not supported by substantial evidence and that the ALJ failed to perform a proper function-by-function analysis. In support, William points to his own testimony, including his continued right knee pain and swelling, need to lie down with his right leg elevated multiple times a day to reduce pain, and difficulty standing, walking, and climbing. William contends that the ALJ failed to make specific findings about whether his impairments would result in pain or fatigue requiring him to take breaks, or how often those breaks would occur. The Commissioner counters that the ALJ accounted fully for William's limitations and substantial evidence supports the RFC.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions

reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p and contains sufficient information to allow meaningful review. Unlike in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a full analysis

6

of William's medical records, the medical opinions, hearing testimony, and the ALJ's conclusions.

Substantial evidence supports the ALJ's physical RFC assessment and the ALJ's opinion specifies how the limitations in the RFC correlate with William's impairments. The ALJ wrote that on discharge from physical therapy in April 2019, the physical therapist noted William "could climb stairs, squat, and walk on uneven surfaces without difficulty . . . [he] had made excellent progress with range of motion, strength, and balance, and he had been able to resume all his activities of daily living and had met all his established goals." R. 21. Likewise, William reported no pain to his doctor at a follow-up in May 2019. R. 22, 406. Based on this, the ALJ concluded that "the record indicates six months after his surgery, [William] had returned to essentially normal functioning." Id. Subsequent records also support this, as the ALJ noted that "[William] reported to [Dr. Waldrop] in December 2019 [that] he was doing quite well," Dr. Waldrop assessed him as doing "fine" and the record contains no subsequent complaints about his knee. R. 447.

The ALJ explained that, though Dr. Waldrop indicated a limitation to lifting/carrying 50 pounds, this was a maximum limitation, and "indicates [William] would be more limited regarding frequent lifting/carrying." R. 22. As such, the ALJ determined William could lift at the light level, 20 pounds occasionally and 10 pounds frequently. Id. The ALJ further explained that the record, including mowing two yards with no symptoms, riding a bike, and being discharged from physical therapy having met all goals, supports William being able to stand and walk frequently during the workday. Id. Regarding the RFC limitations for certain postural activities, the ALJ reasoned that, as William met all his goals in physical therapy, including being able to squat and climb stairs without difficulty, this supports a finding that he can crouch, kneel and

7

climb stairs occasionally. R. 23. Accordingly, I recommend finding that substantial evidence supports the ALJ's physical RFC determination.

### C. Subjective Allegations and Dr. Waldron's Opinion

William argues that the ALJ's assessment of his allegations is not supported by substantial evidence. In support, William contends the ALJ erred by relying on his daily activities to show he is capable of working, including by failing to acknowledge the activities are performed intermittently or at his own pace. William also points to Dr. Waldrop's opinion that William should not squat or kneel and would be limited in climbing stairs.[7] The Commissioner counters that substantial evidence supports the ALJ's evaluation of William's subjective complaints.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[8] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to

---

[7] William characterizes Dr. Waldrop's opinion as indicating he "should not climb stairs." Pl.'s Br. at 13, Dkt. 15. In fact, Dr. Waldrop writes, "I do feel that [William] should *limit* any type of climbing [] stairs . . . ." R. 406 (emphasis added). As the ALJ points out, Dr. Waldrop "stated [William's] stair climbing 'was limited,' but this does not indicate how much." R. 23.

[8] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

The ALJ's opinion includes a full discussion of William's medical history, even prior to his alleged onset date and knee surgery, and the ALJ adequately supported his finding that William's allegations were not entirely consistent with the medical evidence and other evidence in the record. The ALJ acknowledged William's complaints related to swelling and pain in his knee that "comes and goes" as well as his testimony that he needs to rest during the day and prop up his foot. R. 19. However, the ALJ found that these allegations were not entirely consistent with the medical evidence. In support, the ALJ wrote:

> [William] was discharged from physical therapy in April 2019 after meeting all his goals. He was able to climb stairs, squat, and walk on uneven surfaces then. He did not report pain to [Dr. Waldron] in May 2019, [who] did not see findings of concern in May 2019. Thus, the record indicates six months after his surgery, he had returned to essentially normal functioning.

R. 22. The ALJ continued, emphasizing that later records continue to indicate this return to normal functioning. Id. Indeed, as the ALJ points out, William has no other records showing visits to a doctor or complaints about his knee after the December 2019 visit where, "the provider assessed he was doing fine." Id.

Finally, the ALJ appropriately considered William's daily activities, including his report to his physical therapist in March 2019 that "he was able to do five hours of work at home with more than half the time spent standing without 'paying for it'" and other reports of riding a

9

bicycle and mowing lawns, as just one of multiple reasons to discount his subjective allegations. R. 21. Unlike the cases William cites to in his brief, the ALJ does not overstate or mischaracterize the extent of William's activities. The ALJ specifically acknowledged William's report that he must take a break after cooking 30 minutes, needs to stop and stretch hourly while on a trip, and that he reported pain "after riding in a car a longer distance" in March 2019. R. 19, 22. Other reasons for discounting William's subjective allegations included his successful physical therapy ending in April 2019, no complaints of knee pain after May 2019, no visits to his orthopedic doctor after December 2019, and the opinions of the state agency doctors that he could perform light work. At the hearing, the ALJ questioned William as follows:

> ALJ: [T]he last records that we have from your orthopedic doctor are back in December of 2019 . . . . Why haven't you been back to any of your doctor's about the ongoing issues and problems you're having?
> William: Well, my doctor said as long as I was doing as well as I was, I was released for five years.
> ALJ: Okay. And you had told your doctor about the pain and the issues and problems you were having?
> A: Yes.

R. 47. William does not identify any reversible error in the ALJ's analysis or "point to *any* specific piece of evidence not considered by the [ALJ] that might have changed the outcome of his disability claim." Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). William's argument that the ALJ ignored the evidence from two medical appointments in April and May 2019, showing "altered gait, mild to moderate effusion" and reduction in right knee range of motion does not meet this standard. Pl.'s Br. at 14, Dkt. 15. The ALJ clearly understood William's treatment, and his relatively steady improvement from the date of his surgery in December 2018 until December 2019, his last medical visit on the record regarding his knee,

when he was "doing just fine" and reported "minimal if any pain." R. 447. At this December 2019 appointment he had no effusion, excellent range of motion, good stability, and an x-ray showed the knee replacement in good position with no loosening. R. 447–48. Additionally, there is no requirement that an ALJ refer to every piece of medical evidence in the record. See Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (noting "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"); Russell v. Chater, 60 F.3d 824, 1995 WL 417576 *3 (4th Cir.1995). At bottom, William urges the Court to reweigh the same record and medical exhibits considered by the ALJ, and to conclude differently. However, the ALJ's job is to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work.  See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight).

Finally, William argues that the ALJ erred in assessing his allegations because Dr. Waldrop concluded he should avoid squatting, kneeling, or combing stairs, and the ALJ wrongfully discounted Dr. Waldron's opinion. Contrary to William's argument that the ALJ ignored "the rest of the December 16, 2019 note in which Dr. Waldrop then stated that he and [William] again discussed the activity modification that had been previously established" the ALJ specifically acknowledged this portion of the note. The ALJ wrote earlier in his opinion regarding the December 16, 2019 visit, "[Dr. Waldron] assessed [that William] appeared to be doing just fine; functionally he was doing fine. [Dr. Waldron] felt that the previous work note still stood." R. 22.

The ALJ explained that Dr. Waldron's limitations in squatting, kneeling, and climbing are "not supported by [his] lack of findings of concern in [the May 2019] visit, as well as his assessment that [William] was functionally fine in December 2019." R. 23. Beyond discounting the opinion on these grounds, the ALJ also cites to conflicting record evidence showing that William achieved all his goals in physical therapy, including being able to squat without difficulty at his April 2019 physical therapy visit. At this visit, his knee discharge summary describes William as having no difficulty ascending or descending stairs, no difficulty squatting to retrieve items from the floor, and no assistive device needed on even or uneven surfaces. R. 523. William never returned to physical therapy after discharge. Thus, the ALJ followed the regulations in assessing both the supportability and consistency of Dr. Waldron's opinion.[9] Contrary to William's argument, the reasons given by the ALJ for rejecting Dr. Waldron's limitations relating to squatting, kneeling, and crouching, are both adequately explained, and supported by substantial evidence in the record.

Accordingly, I conclude that the ALJ supported his analysis of William's subjective complaints with substantial evidence and did not err in weighing the opinion of Dr. Waldron, and that William is capable of performing work at the level stated in the ALJ's opinion.

---

[9] William submitted his application in August 2019, thus 20 C.F.R. §§ 404.1520c governs how the ALJ considered the medical opinions. When making an RFC assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide, however, that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimants' medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. Id. "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization, and other factors such as an understanding of the disability program's policies and evidentiary requirements. Id.

## CONCLUSION

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Thomas T. Cullen, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered: November 30, 2022

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge